# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Midwest Ozone Group,

Petitioner,

v.

United States Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency,

Respondents.

**On Petition For Judicial Review Of Final Agency Action Of The United States Environmental Protection Agency, 89 Fed. Reg. 39,508 (May 7, 2024)**

**MOTION FOR STAY**

David M. Flannery
Kathy G. Beckett
Keeleigh S. Huffman
Steptoe & Johnson PLLC
Post Office Box 1588
Charleston, WV 25326
(304) 353-8000
Dave.Flannery@steptoe-johnson.com
Kathy.Beckett@steptoe-johnson.com
Keeleigh.Huffman@steptoe-johnson.com

Edward L. Kropp
Steptoe & Johnson PLLC
Post Office Box 36425
Indianapolis, Indiana 46236
(317) 946-9882
Skipp.Kropp@steptoe-johnson.com

*Counsel for Midwest Ozone Group*

Dated: July 8, 2024

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Midwest Ozone Group provides the following:

## A. Parties, Intervenors, and Amici Curiae

Petitioners:

- No. 24-1119: State of North Dakota; State of West Virginia; State of Alaska; State of Arkansas; State of Georgia; State of Idaho; State of Indiana; State of Iowa; State of Kansas; Commonwealth of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Oklahoma; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Commonwealth of Virginia; State of Wyoming

- No. 24-1154: NACCO Natural Resources Corporation

- No. 24-1184: Oak Grove Management Company, LLC; Luminant Generation Company LLC

- No. 24-1179: National Rural Electric Cooperative Association; Lignite Energy Council; National Mining Association; Minnkota Power Cooperative, Inc.; East Kentucky Power Cooperative, Inc.; Associated Electric Cooperative, Inc.; Basin Electric Power Cooperative; Rainbow Energy Center, LLC

- No. 24-1190: Talen Montana, LLC

- No. 24-1194: Westmoreland Mining Holdings LLC

- No. 24-1201: America's Power; Electric Generators MATS Coalition

- No. 24-1217: NorthWestern Corporation, d/b/a NorthWestern Energy

- No. 24-1223: Midwest Ozone Group

<u>Respondents:</u>

- Respondents are the United States Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency.

<u>Intervenors for the Respondents:</u>

- San Miguel Electric Cooperative, Inc

<u>Intervenors for the Respondents:</u>

- Air Alliance Houston; Alliance of Nurses for Healthy Environments; American Academy of Pediatrics; American Lung Association; American Public Health Association; Chesapeake Climate Action Network; Citizens for Pennsylvania's Future; City of Baltimore; City of Chicago; City of New York; Clean Air Council; Clean Wisconsin; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; District of Columbia; Downwinders at Risk; Environmental Defense Fund; Environmental Integrity Project; Montana Environmental Information Center; Natural Resources Council of Maine; Natural Resources Defense Council; Ohio Environmental Council; Physicians for Social Responsibility; Sierra Club; State of Connecticut; State of Illinois; State of Maine; State of Maryland; State of Michigan; State of Minnesota; State of New Jersey; State of New York; State of Oregon; State of Rhode Island; State of Vermont; State of Wisconsin

## B. Rulings Under Review

Petitioners challenge a final action taken by the United States Environmental Protection Agency on May 7, 2024, published in the Federal Register 89 Fed. Reg. 39,508, entitled *"National Emission Standards for Hazardous Air Pollutants: Coal - and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review."*

## C. Related Cases

There are no additional cases pending in other U.S. Courts of Appeals challenging the same final action.

# RULE 26.1 DISCLOSURE STATEMENT

The Petitioner makes the following statement pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26:

***The Midwest Ozone Group*** is a 'trade association,' within the meaning of Circuit Rule 26.1(b), as it is a continuing association of organizations and individual entities operated to promote the general interests of its membership on matters related to air emissions and air quality. Midwest Ozone Group has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public, although specific individuals in the membership of Midwest Ozone Group have done so. Midwest Ozone Group has no outstanding shares or debt securities in the hands of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in Midwest Ozone Group.

# TABLE OF CONTENTS

**Page**

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES** ........ ii

**RULE 26.1 DISCLOSURE STATEMENT** ................................................ v

**TABLE OF AUTHORITIES** ................................................................ vii

**GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND TERMS** ............... viii

**INTRODUCTION** ............................................................................... 1

**BACKGROUND** ................................................................................. 2

**ARGUMENT**

    I.    Midwest Ozone Group Is Likely To Succeed On The Merits ........................ 4

    II.   Midwest Ozone Group's Membership Will Suffer Immediate Irreparable Harm Without A Stay ................................................................................ 5

    III.  The Balance Of Harms And The Public Interest Strongly Favor A Stay ....... 8

**CONCLUSION** ................................................................................... 11

**CERTIFICATE OF COMPLIANCE** ...................................................... 12

**CERTIFICATE OF SERVICE** ............................................................. 13

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Michigan v. EPA*, 576 U.S. 743 (2015) ............................................................ 2-3

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)............................................5

*Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841 (D.C. Cir. 1977). .........4

*Armour & Co. v. Freeman*, 304 F.2d 404 (D.C. Cir. 1962) ...................................5

*Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010) .................................................6

**Federal Statutes**

42 U.S.C. 7412 ..................................................................................... 2, 5

**Federal Register Notices**

89 Fed. Reg. 39,508 (May 7, 2024) .......................................................3

88 Fed. Reg. 24,854 (April 24, 2023) ...................................................3

85 Fed. Reg. 31,286 (May 22, 2020).....................................................3

77 Fed. Reg. 9,304 (Feb. 16, 2012).......................................................2

65 Fed. Reg. 79,825 (Dec. 20, 2000) ....................................................2

# GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND TERMS

| | |
|---|---|
| CAA | Clean Air Act |
| HAP | hazardous air pollutants |
| EPA | United States Environmental Protection Agency |
| EGU | electricity generating unit |
| MATS | Mercury and Air Toxics Standards |
| MACT | Maximum Achievable Control Technology |
| Rule | *National Emission Standards for Hazardous Air Pollutants: Coal - and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 89 Fed. Reg. 39,508 (May 7, 2024) |

## INTRODUCTION

This motion seeks a stay of the final rule of the United States Environmental Protection Agency ("EPA") entitled *"National Emission Standards for Hazardous Air Pollutants: Coal - and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review".* 89 Fed. Reg. 39,508 (May 7, 2024) ("Rule").

This Rule is just one of a series of recent actions by EPA with economy-wide implications and serious potential for negative impacts to the domestic energy grid. EPA has turned its cheek to stakeholders that have repeatedly shown that the Rule will result in a decline of grid reliability due to an increase in economic pressure on coal and oil fired electricity generating units ("EGUs"), forcing them to choose between investment in control measures that are not cost-effective or early retirement.

A stay is necessary in order to stop the Rule from taking effect, resulting in immediate harm and irreparable injury to Midwest Ozone Group's membership, and untold injury to the electric power industry that will cause a ripple effect impacting on consumers of electricity and the public. As such, the Rule should be stayed pending review by this Court.

Midwest Ozone Group supports the Motions filed by North Dakota *et.al.* (Case No. 24-1119), NACCO Natural Resources Corporation (Case No. 24-1154), National Rural Electric Cooperative Association *et. al.* (Case No. 24-1179), Talen Montana, LLC (Case No. 24-1190), NorthWestern Corporation (Case No. 24-1201) and Westmoreland Mining Holdings LLC (Case No. 24-1194), and to avoid repeating those

arguments and to reduce the burden on the Court, Midwest Ozone Group hereby incorporates those arguments into this motion by reference.

## BACKGROUND

Clean Air Act, in Section 112, authorizes EPA to regulate hazardous air pollutant ("HAP") emissions from "stationary sources." *See Michigan v. EPA*, 576 U.S. 743, 747-48 (2015); 42 U.S.C. §7412. This regulatory process begins with EPA publicizing a list of categories deemed to be sources of HAP emissions. 42 U.S.C. §7412(c). In order to properly include an EGU on this list, EPA must "perform a study of the hazards to public health reasonably anticipated to occur" from HAP emissions from the EGU. *Id.* §7412(n)(1)(A). Following the study, if EPA finds that regulation is still "appropriate and necessary," it may so regulate an EGU. *Id.*

Additionally, HAP emissions standards are referred to as maximum achievable control technology ("MACT") standards. These MACT standards promulgated under Section 112 for new or existing sources of hazardous air pollutants must "require maximum degree of reduction in emissions of the hazardous air pollutants subject to this section … taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements…" *Id.* §7412(d)(2). Eight years after a final MAC standard is promulgated, EPA must not only conduct a one-time residual risk analysis but also review and revise the standards as appropriate. *See Id.* §7412(f)(2); *Id.* §7412(d)(6).

EPA determined that regulating coal- and oil fired EGUs was "appropriate and necessary" in 2000, which led to the promulgation of the first Mercury and Air Toxics Standards ("MATS") rule in 2012. 65 Fed. Reg. 79,825, 79,826 (Dec. 20, 2000); 77 Fed. Reg. 9,304, 9,330 (Feb. 16, 2012) (Original MATS Rule). The Original MATS Rule was successfully appealed by industry to the United States Supreme Court. *See Michigan*, 576 U.S. at 747-50 (holding where costs related to the regulation of power plants under Section 112 of the Clean Air Act are so disproportionate to the benefit, such regulation would not be rational).

In 2020, eight years after the promulgation of the Original MATS Rule, EPA completed the review of risk and the review concerning "necessary" revisions required under Clean Air Act Section 112(f)(2) and 112(d)(6). 85 Fed. Reg. 31,286 (May 22, 2020). EPA's review resulted in a finding that maximum individual excess cancer risk associated with any single EGU was 9-in-1 million. 85 Fed. Reg. at 31,316; *see Residual Risk Assessment for the Coal- and Oil Fired EGU Source Category in Support of the 2020 Risk and Technology Review Final Rule*, EPA-HQ-OAR-2018-0794-4553, App. 10, Tbls. 1 & 2a (Sept. 2019). Further, EPA reported that there were no new developments across "practices, processes, and control technologies" in 2020. *Id.* at 31,218. These findings support a conclusion that revisions EPA made to the Original MATS Rule were unnecessary.

That said, Executive Order 13990 of January 20, 2021, required reconsideration of regulations promulgated under the Trump Administration – including the 2020

3

MATS Reviews. As a result of that reconsideration, EPA proposed and have now finalized revisions to the Original MATS Rule – despite affirming the conclusions of the 2020 MATS Reviews. See 88 Fed. Reg. 24,854 (April 24, 2023); 89 Fed. Reg. 38,508 (May 7, 2024).

## ARGUMENT

Courts traditionally consider four factors to determine whether a stay would be appropriate. The factors are as follows: (1) likelihood of success on the merits; (2) risk of irreparable harm to movant; (3) risk of injury to non-movants; and (4) whether a stay would be in the public interest. *Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 842-43 (D.C. Cir. 1977). Each of these factors fall in favor of the Midwest Ozone Group. Upon reviewing the facts in light of the stay factors, the Court here will find that a stay is warranted in this case.

## I. Midwest Ozone Group Is Likely To Succeed On The Merits.

A court may invalidate actions taken by EPA that are arbitrary, capricious, an abuse of discretion, not in accordance with the law, contrary to a constitutional right, in excess of statutory jurisdiction, or without proper observance of administrative procedure as required by law. 42 U.S.C. §7607(d)(9). Such is the case with the Rule challenged here.

The Rule here is arbitrary and capricious and in excess of the authority given to EPA by and through the Clean Air Act. EPA is required to revise MACT standards "as necessary" and in consideration of "developments in practices, processes, and control

4

technologies." It is clear that the statutory language in Section 112 of the Clean Air Act only directs EPA to revise a standard if it determines that a revision is necessary to prevent an adverse environmental impact. Here, EPA points to no additional adverse environmental impacts caused by emission of mercury or non-mercury metal HAPs. Indeed, in this case, EPA can only point to benefits of additional reductions of ozone and particulate matter, which are criteria pollutants, and not HAPs which are the purported subject of the Rule. In a case such as the challenged Rule, when the agency knows that the residual risk of the constituent it purportedly is attempting to address is acceptable with an ample margin of safety, it should not be issuing new standards. As such, EPA is entirely without authority to revise the MACT standards and therefore, without authority to promulgate the Rule. *See* 42 U.S.C. § 7412(d)(6).

Petitioner Midwest Ozone Group asserts, along with the other Petitioner-Movants, that the Rule challenged here is outside of the scope of the Clean Air Act. It is therefore likely that the Rule is without legal authority, and that Petitioner Midwest Ozone Group will succeed on the merits of this case.

## II.  Midwest Ozone Group's Membership Will Suffer Irreparable Harm Absent A Stay.

The risk of irreparable harm for the membership of the Midwest Ozone Group is incredibly high. Without a stay, the membership of Midwest Ozone Group will find it difficult to maintain the same productivity and operation while budgeting for the exorbitant cost of compliance. The unrecoverable economic losses combined with the

costly substantial operational changes amounts to irreparable harm which necessitates a stay. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs."); *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (Any "loss of profits which could never be recaptured" is an irreparable harm.); *Sottera, Inc. v. FDA*, 627 F.3d 891, 899 (D.C. Cir. 2010) (injunctive relief appropriate to avoid unrecoverable economic injury).

EPA has grossly underestimated the cost of installing and operating Continuous Emissions Monitoring Systems for particulate matter, grossly overestimated the cost of stack testing, and has failed to provide the true additional costs of the proposal. Further, as a consequence of under-predicting capital required for electrostatic precipitator control equipment "rebuild" and not recognizing the need for a design and operating margin, EPA under-predicts the number of units requiring retrofit or upgrade by half (20 vs 37). Comments of Midwest Ozone Group (June 23, 2023). Doc. ID. EPA-HQ-OAR-2018-0794-5923. As a result, EPA's estimate of incurred cost of $12,200-$14,700/ton to comply with an emission rate of 0.010 lb/MMBtu is only one quarter of the $47,371/ton average cost projected by units for which there is publicly available data.[1] As such, EPA has grossly overestimated costs of stack testing for compliance and

---

[1] *Technical Comments on National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-fired Electric Utility Steam Generating Units Review of Residual Risk and Technology*, Prepared for National Rural Electric Cooperative Association American Public Power Association, America's Power, Midwest Ozone Group, NAACO, National Mining

grossly underestimated the cost of installation, maintenance, and operation of such Continuous Emissions Monitoring Systems for compliance.

In addition to its cost, the requirement for such Continuous Emission Monitoring Systems creates compliance uncertainty for companies that have been relying on periodic stack testing for compliance. The Rule here revises not only the numerical value, but both the compliance determination technique and the averaging period as well. EPA is essentially punishing the sources that have met the low emitting EGU limit of the MATS Rule (0.015 lb/MMBtu) by eliminating the reward of testing once every three years after a lengthy demonstration of the ability to meet that limit.

Grid reliability is another key concern raised by the regulated community about EPA's efforts to redefine electric power generation in this Rule. *Id.* This concern has largely been ignored by EPA. Further detail of the adverse impacts to the electric grid are included in the declarations provided by other Petitioner-Movants. For example, a declaration offered by Gavin A. McCollam of Basin Electric Power Cooperative, showcases how lignite powerplants will be impacted by the Rule. *See* Petitioners' Motion to Stay Final Rule*, National Rural Electric Cooperative Association, et al. v. United States Environmental Protection Agency,* No. 24-1179, *McCollam Decl.* at 15 (D.C. Cir. filed June 21, 2024) ("NRECA Stay Motion"). McCollam notes that "an immense amount of coordination between different regulated facilities" and further, it will "likely involve

---

Association, Power Generators Air Coalition, prepared by Cichanowicz, Marchetti, and Hein, June 19, 2023. Doc. ID EPA-HQ-OAR-2018-0794-5978.

serious risks to the reliability of electric grids providing power to the region while the removal equipment at each of the impacted facilities are taken offline to undergo the additions and upgrades required by the Final Rule." *Id.* Of course, these harms to the grid will not be suffered by lignite powerplants alone. Tawny Bridgeford, General Counsel & Senior Vice President, Regulatory Affairs for the National Mining Association, expresses concern over EPA's "pattern of ignoring the alarms raised by grid experts concerning the threats to grid reliability resulting from rapid early retirement of dispatchable resources" and states that Rule will "accelerate the forced retirement of needed coal plants and exacerbate the reliability crisis." NRECA Stay Motion, *Bridgeford Decl.* at 8. Further, Jerry Purvis, Vice President of Environmental Affairs at East Kentucky Power Cooperative, Inc, emphasizes that the interruption of power supply or failure of the electric grid would result in economic losses to the private and public sectors, shutdowns, property damage, diminished productivity, as well as health and environmental consequences. *See* NRECA Stay Motion, *Purvis Decl.* at 16-17.

It is evident that the harm that this Rule causes is widespread across oil and coal electric power providers. A stay of the Rule will ensure that the grid remains intact to provide the power generation needed to support the United States economy.

## III. The Balance Of Harms And The Public Interest Strongly Favor A Stay.

Contemplation of the consequences that would flow from this Court's decision to grant or deny the request indicates that the balance falls in favor of a stay. There is no indication that a stay will injure other parties. States and regulated powerplants are

governed by a myriad of existing regulations that limit air emissions. Should the Court grant the requested stay these other regulations will not become invalidated or somehow cease to exist. Those important environmental laws will remain in effect in the event of a stay and will continue to remain in force long after this Rule is tested. No environmental harm will come to pass by staying this Rule to ensure that it is legally sound. As such, EPA cannot assert that any harm will come from a careful review of the validity of this agency action.

The economic harm to the regulated community that will come with the Rule far outweighs the benefits attributable to the stated purpose of the rule of reducing emissions of mercury and non-mercury metal HAPs. The Rule seeks to add additional costs of operations, forcing merchant coal-fired generators out of business and putting rate-based coal-fired generation at risk, while EPA's own material demonstrates that the Rule will not result in any meaningful environmental benefits achieved by reduction in mercury and non-mercury metals. The Regulatory Impact Analysis for the Rule in its proposal stage, conceded the following regarding EPA's own cost-benefit analysis:

> [t]he results presented in this section [Comparison of Benefits and Costs] provide an incomplete overview of the effects of the proposal, because important categories of benefits, including health and environmental benefits from reducing mercury and non-mercury metal HAP emissions and the increased transparency and accelerated identification of anomalous emission anticipated from requiring CEMS, were not monetized and are therefore not directly reflected in the quantified benefit-cost comparisons.

U.S. Environmental Protection Agency, *Regulatory Impact Analysis for the Proposed National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review* at 206 (April 2023). In the Regulatory Impact Analysis for the Rule as finalized, EPA made a similar statement:

> [d]ue to current data and modeling limitations, quantified and monetized benefits from reducing Hg and non-Hg HAP metals emissions are not included in the monetized benefits presented here. We are also unable to quantify the potential benefits from the CEMS requirement. Due to data and modeling limitations, there are also still many categories of climate impacts and associated damages that are not reflected yet in the monetized climate benefits from reducing $CO_2$ emissions.

U.S. Environmental Protection Agency, *Regulatory Impact Analysis for the Proposed National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review* at 214 (April 2024). EPA continues to explicitly state it cannot account for many of the benefits it is suggesting the Rule will have, but further, notes that it does not consider other additional costs to the regulated community. In addition, EPA does not account for "changes in costs and benefits due to changes in economic welfare of suppliers to the electricity market or to non-electricity consumers from those suppliers. Furthermore, costs due to interactions with preexisting market distortions outside the electricity sector are omitted." *Id.* EPA has no basis in the record to show that there are any significant benefits to this Rule, so in turn, EPA minimizes its discussion of costs versus benefits. This is improper, inappropriate, and is a textbook example of improper rulemaking under Section 112 of the Clean Air Act.

EPA has failed to show any benefits this Rule will have on air quality or environmental health throughout the Rule's promulgation. EPA cannot show how a stay of this Rule will result in harm to air quality or environmental health. The regulated community, of which the Midwest Ozone Group and its membership are part, and the United States economy, face immediate irreparable harm as a result of this Rule. Accordingly, a stay of the Rule is necessary.

## CONCLUSION

The Midwest Ozone Group respectfully requests that the Court grant this Motion for Stay of the Rule to prevent irreparable harm to its membership and the domestic electricity grid.

# CERTIFICATE OF COMPLIANCE

The foregoing motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A), Fed. R. App. P. 27(a)(2)(B), Fed. R. App. P.32(f) and D.C. Cir. R. 32(e)(1), because it contains 2,650 words, excluding exempted parts, according to the count of Microsoft Word 2010. I further certify that the foregoing motion also complies with Fed. R. App. P. 32(a)(5)-(6) and D.C. Cir. R. 27(d)(1)(E) because it has been prepared using Microsoft Word 2010 in 14-point proportionally spaced Garamond typeface.

_____
David M Flannery

David M. Flannery
Steptoe & Johnson PLLC
707 Virginia Street, East
Post Office Box 1588
Charleston, West Virginia 25326
(304) 353-8000
Dave.Flannery@steptoe-johnson.com

# CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of July 2024, the foregoing Motion For Stay was served electronically on all registered counsel through the Court's CM/ECF system.

David M Flannery

David M. Flannery
Steptoe & Johnson PLLC
707 Virginia Street, East
Post Office Box 1588
Charleston, West Virginia 25326
(304) 353-8000
Dave.Flannery@steptoe-johnson.com