ORAL ARGUMENT NOT YET SCHEDULED

Nos. 24-1201 (consolidated with No. 24-1119)

# In the United States Court of Appeals for the District of Columbia Circuit

———

AMERICA'S POWER

AND

ELECTRIC GENERATORS MATS COALITION,

*Petitioners,*

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

———

## PETITIONERS' MOTION FOR STAY PENDING JUDICIAL REVIEW

———

Makram B. Jaber
Allison D. Wood
Aaron M. Flynn
MCGUIREWOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 857-1700
mjaber@mcguirewoods.com

*Counsel for Petitioners America's Power and Electric Generators MATS Coalition*

CERTIFICATE AS TO PARTIES

Pursuant to Circuit Rules 18(a)(4), 27(a)(4), and 28(a)(1)(A), Petitioners America's Power and Electric Generators MATS Coalition submit this certificate as to parties.

A.    **Parties and Amici**. Because these consolidated cases involve direct review of final agency action, the requirement to furnish a list of parties, intervenors, and *amici* that appeared below is inapplicable. These cases involve the following parties:

**Petitioners:**

No. 24-1119: State of North Dakota, State of West Virginia, State of Alaska, State of Arkansas, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, Commonwealth of Virginia, and State of Wyoming.

No. 24-1154: NACCO Natural Resources Corporation.

No. 24-1179: National Rural Electric Cooperative Association, Lignite Energy Council, National Mining Association, Minnkota Power Cooperative, Inc., East Kentucky Power Cooperative, Inc., Associated Electric Cooperative Inc., Basin Electric Power Cooperative, and Rainbow Energy Center, LLC.

No. 24-1184: Oak Grove Management Company, LLC and Luminant Generation Company LLC.

No. 24-1190: Talen Montana, LLC.

No. 24-1194: Westmoreland Mining Holdings LLC, Westmoreland Mining LLC, and Westmoreland Rosebud Mining LLC.

No. 24-1201: America's Power and Electric Generators MATS Coalition.

No. 24-1217: NorthWestern Corporation d/b/a NorthWestern Energy.

No. 24-1223: Midwest Ozone Group.

**<u>Respondents:</u>**

The United States Environmental Protection Agency ("EPA").

Michael S. Regan, Administrator of the United States Environmental Protection Agency.

**Intervenors and *Amici*:**

In 24-1119 and all consolidated cases: San Miguel Electric Cooperative, Inc., in support of Petitioners.

In 24-1119 and all consolidated cases: Environmental and Public Health Organizations (Air Alliance Houston, Alliance of Nurses for Healthy Environments, American Academy of Pediatrics, American Lung Association, American Public Health Association, Chesapeake Climate Action Network, Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Downwinders at Risk, Environmental Defense Fund, Environmental Integrity Project, Montana Environmental Information Center, Natural Resources Council of Maine, Natural Resources Defense Council, the Ohio Environmental Council, Physicians for Social Responsibility, and Sierra Club), Commonwealth of Massachusetts, State of Minnesota, State of Connecticut, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of New Jersey, State of New York, State of Oregon, Commonwealth of

Pennsylvania, State of Rhode Island, State of Vermont, State of Wisconsin,

District of Columbia, City of Baltimore, City of Chicago, City of New York

in support of Respondents.

/s/ *Makram B. Jaber*
Makram B. Jaber

The undersigned certifies that this motion for stay complies with Circuit Rule 18(a)(1). Petitioners America's Power and Electric Generators MATS Coalition submitted a Petition for Administrative Stay Pending Judicial Review to the United States Environmental Protection Agency ("EPA") on July 5, 2024. EPA has not acted on that request. Therefore, Petitioners now seek a stay from this Court. In accordance with Circuit Rule 18(a)(2), undersigned counsel notified EPA's counsel (as well as all parties) by email on July 6, 2024, that Petitioners planned to file this motion for stay.

/s/ *Makram B. Jaber*
Makram B. Jaber

# RULE 26.1 DISCLOSURE STATEMENTS

## AMERICA'S POWER

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, America's Power submits the following statement:

America's Power is a nonprofit membership corporation organized under the laws of the District of Columbia and is recognized as a tax-exempt trade association by the Internal Revenue Service under Section 501(c)(6) of the Internal Revenue Code. America's Power is the only national trade association whose sole mission is to advocate at the federal and state levels on behalf of coal-fueled electricity, the coal fleet, and its supply chain. America's Power supports policies that promote the use of coal to assure a reliable, resilient, and affordable supply of electricity to meet our nation's demand for energy.

America's Power is a "trade association" within the meaning of Circuit Rule 26.1(b). It has no parent corporation, and no publicly held company owns a 10% or greater interest in America's Power.

**ELECTRIC GENERATORS MATS COALITION**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Electric Generators MATS Coalition submits the following statement:

Electric Generators MATS Coalition is an *ad hoc* coalition of electric generating companies that have joined together for the purpose of filing this petition for review. The members of the *ad hoc* coalition own and operate electric generating units that are subject to the Final Rule at issue in this case. The members of the *ad hoc* coalition are the Salt River Project Agricultural Improvement and Power District; Talen Energy Supply, LLC; and North-Western Energy Public Service Corporation.

Electric Generators MATS Coalition has no parent corporation, and no publicly held corporation has a 10% or greater ownership in it.

Dated: July 8, 2024                      Respectfully submitted,

/s/ *Makram B. Jaber*
Makram B. Jaber
Allison D. Wood
Aaron M. Flynn
McGuire Woods LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 857-1700
mjaber@mcguirewoods.com
awood@mcguirewoods.com
aflynn@mcguirewoods.com

*Counsel for Petitioners America's Power
and Electric Generators MATS Coalition*

# TABLE OF CONTENTS

**Page**

Certificate as to Parties ...........................................................................i

Certificate of Compliance with Circuit Rules 18(A)(1) and (A)(2) ................ v

Rule 26.1 Disclosure Statements ....................................................... vi

Table of Contents ........................................................................ ix

Table of Authorities ...................................................................... xi

Glossary .................................................................................. xv

Introduction ..............................................................................1

Background ...............................................................................1

Argument .................................................................................2

     I.      Petitioners Are Likely to Prevail on the Merits. ...........................4

          A.     A Rational Rule Cannot Impose Hundreds of Millions of Dollars in Economic Costs in Return for Trivial Benefits.........................................................4

          B.     The Rule Is Arbitrary and Capricious Because It Rests on a Deeply Flawed Technical Foundation, Does Not Account For a Compliance Margin, And Results in an fPM Standard That Is Highly Cost *In*effective. ...............................................9

               1.     The Revised fPM Standard's Technical Foundation is Deeply Flawed.....................................9

               2.     EPA's Refusal to Account for a Compliance Margin is Unreasonable.............................................17

               3.     EPA's Failure to Account for the Shortened Life of the Vast Majority of Coal-Fired EGUs is Deeply Flawed. .........................................22

     II.     The Balance of Harms and the Public Interest Weigh Heavily in Favor of a Stay.............................................26

      A.    Absent a Stay, the Rule Will Cause Irreparable Harm to Petitioners and Their Members............................26

      B.    A Stay Will Not Harm the Public ........................................26

      C.    The Public Interest Weighs in Favor of a Stay...................27

Conclusion.........................................................................................................27

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Appalachian Power Co. v. EPA,*
    135 F.3d 791 (D.C. Cir. 1998) ..............................................................3, 12

*Ass'n of Battery Recyclers, Inc. v. EPA,*
    716 F.3d 667 (D.C. Cir. 2013) .................................................. 4-5

*Labrador v. Poe,*
    144 S. Ct. 921 (2024) ..............................................................2, 3

*Miami–Dade Cnty. v. EPA,*
    529 F.3d 1049 (11th Cir. 2008)..................................................20

*Michigan v. EPA,*
    576 U.S. 743 (2015) ..............................................................4, 5, 9

*Motor Vehicle Mfrs. Ass'n v. State Farm Auto Mut. Ins. Co.,*
    463 U.S. 29 (1983) ..............................................................17, 22

*Nat. Res. Def. Council v. EPA,*
    808 F.3d 556 (D.C. Cir. 2015) .............................................16, 26

*Ohio v. EPA,*
    No. 23A349, slip op. (June 27, 2024)................................1, 11, 12

*Sierra Club v. Costle,*
    657 F.2d 298 (D.C. Cir. 1981) .........................................3, 11, 21

*U.S. Sugar Corp. v. EPA,*
    830 F.3d 579 (D.C. Cir. 2016) ....................................................12

STATUTES

42 U.S.C. § 7412.........................................................................1

42 U.S.C. § 7412(c)(9) ................................................................6

42 U.S.C. § 7412(c)(9)(B)(i) .......................................................9

42 U.S.C. § 7412(d)(6).................................................................2

42 U.S.C. § 7412(f)(2) .................................................................6

42 U.S.C. §7412(n)(1)(A) ...........................................................5

REGULATIONS

Chemical Compounds in Food-Producing Animals,
    42 Fed. Reg. 10,412 (Feb. 22, 1977) .....................................6

Control of Air Pollution from Motor Vehicles:
Tier 3 Motor Vehicle Emission and Fuel Standards,
    78 Fed. Reg. 29,816 (May 21, 2013)....................................18

National Emission Standards for Hazardous Air Pollutant
Emissions: Hard and Decorative Chromium Electroplating and
Chromium Anodizing Tanks; and Steel Pickling–HCl Process
Facilities and Hydrochloric Acid Regeneration Plants,
    77 Fed. Reg. 58,220 (Sept. 19, 2012)...................................18

National Emission Standards for Hazardous Air Pollutants from
Coal- and Oil-Fired Electric Utility Steam Generating Units and
Standards for Fossil-Fuel-Fired Electric Utility,
Industrial-Commercial-Institutional, and Small
Industrial-Commercial-Institutional Steam Generating Unites,
    77 Fed. Reg. 9,304 (Feb. 16, 2012) ..................................................................2

National Emission Standards for Hazardous Air Pollutants from
Coal- and Oil-Fired Electric Utility Steam Generating Units and
Standards of Performance for Fossil-Fuel-Fired Electric Utility,
Industrial-Commercial-Institutional, and Small
Industrial-Commercial-Institutional Steam Generating Units,
    76 Fed. Reg. 24,976 (May 3, 2011).................................................................18

National Emission Standards for Hazardous Air Pollutants From the
Portland Cement Manufacturing Industry and Standards of
Performance for Portland Cement Plants,
    75 Fed. Reg. 54,970 (Sept. 9, 2010)................................................................18

National Emission Standards for Hazardous Air Pollutants:
Coal- and Oil-Fired Electric Utility Steam Generating Units
Review of the Residual Risk and Technology Review,
    89 Fed. Reg. 38,508 (May 7, 2024)............................................2, 5, 20, 21, 22

National Emission Standards for Hazardous Air Pollutants:
Coal- and Oil-Fired Electric Utility Steam Generating
Units–Reconsideration of Supplemental Finding and
Residual Risk and Technology Review,
    85 Fed. Reg. 31,286 (May 22, 2020).................................................................6

National Emission Standards for Hazardous Air Pollutants:
Stationary Combustion Turbines Residual Risk and
Technology Review,
    84 Fed. Reg. 15,046 (Apr. 21, 2019).................................................................7

New Source Performance Standards for Greenhouse Gas
Emissions from New, Modified, and Reconstructed Fossil
Fuel-Fired Electric Generating Units; Emission Guidelines for
Greenhouse Gas Emissions From Existing Fossil Fuel-Fired
Electric Generating Units; and Repeal of the Affordable
Clean Energy Rule,
  89 Fed. Reg. 39,798 (May 9, 2024)..........................................................23, 24

Proposed Guidelines for Best Available Retrofit
Technology (BART) Determinations Under the
Regional Haze Regulations,
  66 Fed. Reg. 38,108 (July 20, 2001) ............................................................23

**OTHER AUTHORITY**

EPA, *Documentation for EPA's Power Sector Modeling Platform v6 –
Summer 2021 Reference Case* (Sept. 20, 2021),
https://www.epa.gov/power-sector-modeling/documentation-epas-
power-sector-modeling-platform-v6-summer-2021-reference ......................24

# GLOSSARY

| Acronym | Meaning |
|---------|---------|
| EGU | Electric generating units |
| EPA | United States Environmental Protection Agency |
| ESP | Electrostatic Precipitator |
| fPM | Filterable Particulate Matter |
| HAP | Hazardous Air Pollutant |
| MATS | Mercury and Air Toxics Standards |
| MIR | Maximum Individual Risk |
| RTR | Risk and Technology Review |

## INTRODUCTION

A few days ago, the Supreme Court stayed a major Environmental Protection Agency ("EPA") regulation, after finding the rule likely arbitrary and capricious and "the harms and equities [to be] very weighty on both sides." *Ohio v. EPA*, No. 23A349 (and consolidated cases), slip op. at 10 (June 27, 2024) (quotation omitted). The instant rule causes substantial, irreparable harm to coal-fired electric generating units ("EGUs") and the states in which they operate, in return for, at most, a trivial benefit attributable to their hazardous air pollutant ("HAP") emissions. As other Movants have shown, the rule likely violates Section 112 of the Clean Air Act, 42 U.S.C. §7412, and is unlawful.[1] The Court should stay this rule.

## BACKGROUND

EPA's 2012 Mercury and Air Toxics Standards ("MATS") regulate HAP emissions from oil- and coal-fired EGUs under Section 112 of the Clean

---

[1] Heeding this Court's order regarding avoiding duplication and repetition in stay motions, ECF#2062459, Petitioners America's Power and Electric Generators MATS Coalition (collectively, "Petitioners") present arguments not addressed or fully addressed by other Movants and adopts the following stay motions: ECF#2058570; ECF#2061137; ECF#2062093; and ECF#2062097.

Air Act. 77 Fed. Reg. 9,304 (Feb. 16, 2012). The instant "Risk and Technology Review" ("RTR") rule revises MATS under Section 112(d)(6), 42 U.S.C. §7412(d)(6). Specifically, EPA revised the coal-fired EGU filterable particulate matter ("fPM") standard—which is used a surrogate for non-mercury metal HAPs—and the lignite-coal-fired EGU mercury standard. 89 Fed. Reg. 38,508 (May 7, 2024) ("Rule"). Other movants have thoroughly described the twists and turns of this program's regulatory history and the standard for a stay, so we do not repeat them here.[2]

## ARGUMENT

This Rule, much like most EPA rules, involves technical issues. Deciding such issues is difficult, and even more so on a motion for stay "because it can require the Court to assess the merits … earlier and more quickly than is ordinarily preferable, and to do so without the benefit of full merits briefing and oral argument." *Labrador v. Poe*, 144 S.Ct. 921, 928 (2024) (Kavanaugh,

---

[2] This motion primarily addresses EPA's fPM standard revision. We adopt other Movants' discussion and arguments relating to the lignite-coal-fired EGU mercury standard.

J., concurring). When resolving stay motions, courts "cannot avoid that difficulty. It is [perhaps] not ideal, but it is reality." *Id.*

Here, the Court must "endeavor[] to consider thoroughly the claims" presented, even though "the volume and technical complexity of the material necessary for [its] review [could be] daunting…." *Sierra Club v. Costle*, 657 F.2d 298, 314-15 (D.C. Cir. 1981) (footnote omitted). No matter how technically complex the analysis may be, the agency nevertheless must meet its "burden to consider all relevant factors and to identify the stepping stones to its final decision. There must be a rational connection between the factual inputs, modeling assumptions, modeling results and conclusions drawn from these results." *Id.* at 333 (citations omitted). EPA must "examine key assumptions as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule." *See Appalachian Power Co. v. EPA*, 135 F.3d 791, 818 (D.C. Cir. 1998) (quotation omitted).

The Rule fails to meet these standards. Petitioners are likely to succeed on the merits. Absent a stay, the Rule causes irreparable harm to Petitioners

and the industry. A stay would cause no harm to the public, and the public interest favors a stay. The Court should stay the Rule.

## I.    Petitioners Are Likely to Prevail on the Merits.

### A.    A Rational Rule Cannot Impose Hundreds of Millions of Dollars in Economic Costs in Return for Trivial Benefits.

Administrative law and common sense dictate it is irrational to promulgate a rule costing hundreds of millions of dollars when no benefits result from reducing the targeted pollutants. As the Supreme Court admonished in *Michigan v. EPA*, which involved the review of MATS, the "[c]onsideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* disadvantages of agency decisions." 576 U.S. 743, 753 (2015). The Court faulted EPA's refusal to "consider whether the costs of its decision outweighed the benefits," *id.* at 750, explaining "[o]ne would not say that it is even rational … to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits." *Id.* at 752.

It is well-established that cost *is* a major consideration in technology review rulemakings like the Rule. *See, e.g., Ass'n of Battery Recyclers, Inc. v.*

*EPA*, 716 F.3d 667, 673 (D.C. Cir. 2013). Under *Michigan*, therefore, EPA must consider the costs of *this* regulation in relation to benefits intended by Congress in Section 112 mandating *this* regulation—protecting public health from HAPs. *See* 576 U.S. at 751. Moreover, this is not just any source category; it is the category *Michigan* examined and Congress singled out for regulation only upon a determination that it is "appropriate and necessary" to do so. *Id.* at 743; 42 U.S.C. §7412(n)(1)(A). Because *Michigan* held cost and benefits must be considered in determining whether it is "appropriate and necessary" to regulate EGUs under Section 112 in the first place, it necessarily follows that the same consideration must also apply in this rulemaking, which is merely a follow-on to the initial rulemaking.

The statutory purpose of Section 112 is not reduction of HAP emissions for the sake of reduction, as EPA claims, *see* 89 Fed. Reg. at 38,525 ("Congress sought to minimize the emission of hazardous air pollution wherever feasible…."). It is to protect the public from the potential effects of HAPs. The best (maybe only) way to assess the impact of non-mercury metal HAP emissions—which are carcinogenic compounds—is to look at cancer risk. For

that, a maximum individual risk ("MIR") of 1-in-1-million *is* the gold standard.[3] Indeed, Congress applied that gold standard to HAPs regulation under Section 112 by adopting it as the ultimate yardstick in Section 112(f)[4] and as the threshold below which an entire source category could be delisted, i.e., not regulated at all under Section 112.[5]

Here, only three *oil*-fired units in Puerto Rico exceed the 1-in-1-million standard. *See* 85 Fed. Reg. 31,286, 31,319 (May 22, 2020). Yet, the Rule targets only *coal*-fired *EGUs*, all with cancer risks less than 1-in-1-million.

---

[3] "The MIR is defined as the cancer risk associated with a lifetime [(70 years)] of [continuous] exposure at the highest concentration of HAP where people are likely to live." EPA, *Residual Risk Assessment for the Coal- and Oil-Fired EGU Source Category in Support of the 2020 Risk and Technology Review Final Rule*, at 10, 15 (Sept. 2019) (Docket ID EPA-HQ-OAR-2018-0794-4553) ("MATS Risk Assessment").

[4] 42 U.S.C. §7412(f)(2).

[5] 42 U.S.C. §7412(c)(9). The origins of the 1-in-1-million standard is a U.S. Food & Drug Administration rulemaking where the agency determined that standard "can properly be considered of insignificant public health concern." 42 Fed. Reg. 10,412, 10,421 (Feb. 22, 1977). Congress and agencies have since extensively used it as the gold standard for risk evaluation.

Moreover, as the table below shows, the coal-fired EGUs that EPA identified as potentially needing upgraded controls or increased operations and maintenance spending to meet the fPM standard have cancer risks ranging from 0.002 to 0.3 in one million—about 1-3 orders of magnitude below 1-in-1-million.[6] Further, these units have cancer incidences[7] ranging from 0.00000203 to 0.00144 excess cancer cases per year, which is equivalent to one excess case in every 492,610 to 714 years. Collectively, these units have an aggregate cancer incidence of 0.00269 excess cancer cases per year, or one excess case every 371 years.

---

[6] The table provides EPA's risk assessment results for the identified EGUs. *See* MATS RISK ASSESSMENT, App. 10, Tables 1 and 2a. The MIR is expressed in scientific format in EPA's document; we express it here in non-scientific format (e.g., for Colstrip, EPA's report says 1.47E-07, which equals 0.147-in-1-million).

[7] "Cancer incidence" is the number of excess cancer cases per year, taking into account the exposure and the population exposed. The inverse of cancer incidence is the number of years it takes to have one excess cancer case. *See* 84 Fed. Reg. 15,046, 15,060 (Apr. 21, 2019) ("The total estimated cancer incidence from this source category is 0.04 excess cancer cases per year, or one excess case in every 25 years [1/0.4=25].").

## Cancer Risk for Coal-Fired Units that EPA Identified as Needing Additional Action Under the Rule

| Plant Name | Cancer MIR (in 1 million) | Cancer Incidence |
|---|---|---|
| Seminole | 0.309 | 0.000259 |
| Marion | 0.0849 | 0.0000280 |
| Mill Creek | 0.0470 | 0.000136 |
| D B Wilson | 0.144 | 0.0000603 |
| Red Hills Generating | 0.0863 | 0.0000234 |
| Labadie | 0.250 | 0.00144 |
| Colstrip | 0.147 | 0.0000582 |
| Roxboro | 0.0415 | 0.0000271 |
| Mayo | 0.0877 | 0.0000269 |
| Milton R Young | 0.0524 | 0.0000153 |
| Colver Power Project | 0.0486 | 0.0000184 |
| Mt Carmel Cogen | 0.0624 | 0.0000595 |
| Gilberton Power Co. | 0.0412 | 0.0000377 |
| Westwood Generation | 0.00208 | 0.00000203 |
| St. Nicholas | 0.0989 | 0.000104 |
| Martin Lake | 0.137 | 0.000115 |
| Mt Storm | 0.135 | 0.0000240 |
| Harrison | 0.344 | 0.000299 |
| Laramie River Station | 0.134 | 0.00000246 |
| Jim Bridger | 0.0674 | 0.00000784 |

Reducing cancer risk that is already less than 1-in-1-million yields a very small benefit, if any. Indeed, Congress provided a mechanism to delist source categories if their emissions' cancer risk falls below 1-in-1-million. 42 U.S.C. §7412(c)(9)(B)(i). Reducing cancer risk that is already 1 to 3 orders of magnitude below 1-in-1-million yields such an infinitesimal benefit that it is practically zero.

The hundreds of millions of dollars this Rule requires powerplants to expend for this infinitesimal benefit, at best eliminating one excess cancer case every 371 years, is not a rational result from reasoned decision-making. An irrational regulation cannot stand. *Michigan*, 576 U.S. at 750.

**B.    The Rule Is Arbitrary and Capricious Because It Rests on a Deeply Flawed Technical Foundation, Does Not Account For a Compliance Margin, and Results in an fPM Standard That Is Highly Cost *In*effective.**

**1.    The Revised fPM Standard's Technical Foundation is Deeply Flawed.**

In the proposal, EPA based its analysis of the performance of coal-fired EGUs and their likely needed actions and/or controls on an irrationally truncated and arbitrary selection of fPM data. In assigning an fPM emission rate to the units, EPA reviewed the rates measured in no more than two quarters

in 2017, 2019, and for a handful of units in 2021. EPA, *2023 Technology Review for the Coal- and Oil-Fired EGU source Category*, at 2 (Jan. 2023) (Docket ID EPA-HQ-OAR-2018-0794-5789) ("2023 Technology Memo").

EPA provided no reasoned explanation for why it selected these quarters, even though EPA has compliance data for every quarter EGUs have operated since 2017.[8] EPA merely says its data "selection aimed to include recent compliance years during quarters with typically higher electricity demand (winter and summer)." EPA, *2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category (2024 Technical Memo)*, at 3 (Jan. 2024) (Docket ID EPA-HQ-OAR-2018-0794-6919). Commenters pointed to the lack of a rationale for EPA's selection methodology and submitted data showing how variable the data are and demonstrating how unrepresentative EPA's data selection was.

In the Rule, EPA conceded the data it selected in the proposal were not representative and that a broader set of data "exhibited large variability

---

[8] MATS requires reporting of quarterly compliance data to EPA.

within quarters and annually." *Id.* at 5. EPA then devised a brand new methodology to parse the still-truncated dataset it was willing to review.[9] This methodology rests on a new key assumption: if a unit has *ever* emitted less than a standard, EPA assumes the unit will be able to meet that standard *continuously* either without *any* new expenditures or with an additional, small operations and maintenance expenditure of $100,000 per year.[10] *Id.* at 15.

As EPA did with its previous assumption in the proposal, EPA fails to explain or support this fundamental new assumption. It is just a naked statement in a memorandum, nothing more. *Cf. Ohio*, slip op. at 14, 17 (granting stay of EPA rule where EPA's response to a concern raised by commenters

---

[9] EPA continued to refuse to look at all the data it has, because it was too "time-consuming." *Id.* at 3. But "[t]he technical complexity of the analysis does not relieve the agency of the burden to consider all relevant factors." *Costle*, 657 F.2d at 333.

[10] EPA assumes, again with no support whatsoever, that such a unit would be able to meet the standard continuously without any new expenditures if the unit's average emissions rate, based on whatever truncated dataset EPA has for that unit, was less than the standard. If the unit's average emission rate was more than the proposed standard, EPA assumes the unit will meet the standard continuously by expending about $100,000 per year.

"in no way grappled with their concern" and "did not address the … concern so much as sidestep it.").

EPA's failure to support its assumption with any data whatsoever, much less some analysis or any explanation, is, at a minimum, a failure to explain. *Id.* at 13 (EPA's failure to explain means regulation likely unlawful). "The EPA had a duty here to examine and justify the 'key assumptions' underlying its decision, and it failed to do so." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 650 (D.C. Cir. 2016) (quoting *Appalachian Power*, 135 F.3d at 818). That is textbook arbitrary and capricious rulemaking. *Id*.

Data from the Coronado Generating Station (owned by a Coalition member), submitted to EPA in comments,[11] illustrate the lack of support and justification for EPA's key assumptions:

---

[11] Comments of Power Generators Air Coalition, at 15 (June 23, 2023) (Docket ID EPA-HQ-OAR-2018-0794-5994 ) ("PGen Comments").



**Coronado Generating Station 20 Operating Quarters**

In the proposal, EPA examined the performance of Coronado during two quarters: 17Q3 and 19Q3, and it selected the performance of the plant in 19Q3 as representative. Commenters showed (along with many other, similar examples) that Coronado's 19Q3 performance was not representative and, indeed, unusual.[12] Sixteen of the 20 quarters reported showed fPM rates

---

[12] *Id.* The Coronado owner also submitted comments explaining that Coronado operated at high load continuously during that quarter, which allowed

that exceeded the 19Q3 rates, some by 100%. Moreover, the comments explained—along with supporting information—that there was no difference in the Electrostatic Precipitator ("ESP") maintenance done before 19Q3 than that done before 20Q3, yet the 20Q3 rate was much higher. PGen Comments at 14-15. In addition to inherent variability, fPM rates are affected by "myriad factors, likely chief among them the units' duty and coal variability." *Id.* at 15.

In the Rule, EPA's new methodology simply assumes Coronado *can* meet the limit of 0.01 lb/mmBtu without even increased maintenance, because, in one of the 20 quarters, Coronado had a rate as low as 0.0061 lb/mmBtu and had an average for all 20 quarters of slightly under the new standard (0.01 lb/mmBtu). 2024 Technical Memo, Attach. 1. This utterly ignores that Coronado had an entire year (20Q3 to 21Q2), where the rate was well above 0.01 lb/mmBtu for all four quarters, averaging about 0.17

_____

Coronado to avoid "cold starts" and ramping output up and down, thus reducing fPM emissions rates. Comments of Salt River Project, at 3-4 (June 21, 2023) (Docket ID EPA-HQ-OAR-2018-0794-5936). Those are not representative operations for Coronado. *Id.*

lb/mmBtu and reaching about 0.023 lb/mmBtu in 21Q2. EPA provides no explanation in the record why Coronado's rate was much higher than its historic lowest rate for a whole year and why EPA believes Coronado could have met the revised standard without substantial work; just a bald statement that Coronado can meet the standard in the future because it did it once or twice previously. This is like a coach telling his star baseball player, who once hit three home runs in a single game and averaged one home run a game for the last season, that he must now hit two home runs each game going forward. After all, his ability to hit three home runs in one game is demonstrated, and he averaged one home run a game last season. The coach says that if the player consistently follows the same training regimen he followed before the game in which he hit three home runs, then this should be no problem. This is what EPA is expecting from EGUs under the Rule.

There is nothing in the record to support EPA's conclusion that Coronado could have met the 0.01 lb/mmBtu during that year without equipment upgrade. More important, there is no support for EPA's conclusion that Coronado will be able to meet the standard without an equipment upgrade

indefinitely in the future. EPA just *assumed* it, without any basis or explanation. Coronado cannot simply *assume*; it must conduct an engineering study to figure it out, and then it will have to upgrade its ESP by 2027 if the study concludes that is needed—at a cost far in excess of the $0 EPA assigned Coronado.

These unsupported assumptions are central to the Rule and are not harmless error. If the data selection criteria for EPA's analysis are arbitrary and unsupported, the number of units that would have to upgrade to meet the new standard is also arbitrary and unsupported; the cost of upgrades across the industry is arbitrary and unsupported; and the cost-effectiveness results are arbitrary and unsupported.

EPA's decision to turn a "blind eye" to relevant information, for Coronado as well as all for other units (e.g., the fPM emissions data for 20 quarters already in EPA's possession, instead of a few arbitrary quarters of data) and its refusal to account for, or even investigate, the reasons for unit performance variability is arbitrary and capricious. *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 574 (D.C. Cir. 2015). The inherent variability of EGU emission

rates, the reasons for variability, and what actions EGUs must take to meet a new, much tighter standard continuously are "an important aspect of the problem;" EPA cannot assume it away. Its failure to consider it is arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).

## 2. EPA's Refusal to Account for a Compliance Margin is Unreasonable.

EPA based its cost calculations and cost "analysis," such as it is, on its assumption that if a unit ever met a 0.01 lb/mmBtu fPM emission rate in the past, it can meet that rate again, continuously, without upgrading controls. But EPA knows full well no prudent operator runs a unit without a compliance margin. Nevertheless, EPA refused to account for it. EPA's rationale for ignoring compliance margins in the Rule is little more than an admission it is abdicating its responsibility to fully consider the problem before it. That is unlawful. *State Farm*, 463 U.S. at 43.

EPA has long recognized the central importance of compliance margins: "when developing standards [under Section 112], we take into account the uncertainty associated with measuring emissions and we assume that

17

plants operate with a compliance buffer to minimize the likelihood of exceeding the standard." 77 Fed. Reg. 58,220, 58,231 (Sept. 19, 2012). In its 2011 MATS proposal, EPA explained "the numerical standard should account for variability … and provide sufficient compliance margin for owners/operators …." 76 Fed. Reg. 24,976, 25,066 (May 3, 2011). In another HAP rulemaking, EPA established a standard "at a level higher than all measured values (to account for the inability to reliably measure any lower standard) and [to] … provide[] an ample compliance margin." 75 Fed. Reg. 54,970, 54,984 (Sept. 9, 2010). EPA also accounts for compliance margin outside of Section 112. *See, e.g.*, 78 Fed. Reg. 29,816, 29,881 (May 21, 2013) (discussing compliance margin typical for motor vehicle industry and explaining a margin is necessary to account for variability in emissions).

Here, commenters alerted EPA the proposal lacked the necessary compliance margin, meaning EPA's cost calculations were inaccurate as a result. *See* Summary of Public Comments and Responses on Proposed Rule, at 47-48 (Apr. 2024) ("RTC"). Indeed, EPA itself recognized the need for a compliance margin in other aspects of *this* rulemaking. In a memorandum,

prepared for the original MATS rule, EPA recognized "facility operators normally target an operating level that is 25 to 50 percent lower than the emission limit in order to create a 'margin of error.'" EPA, *National Emission Standards for Hazardous Air Pollutants (NESHAP) Analysis of Control Technology Needs for Revised Proposed Emission Standards for New Source Coal-fired Electric Utility Steam Generating Units*, at 1 (Nov. 16, 2012) (Docket ID EPA-HQ-OAR-2009-0234-20223). And in a memorandum seeking to shore up its decision to require fPM continuous monitoring systems in this Rule, EPA found again that a compliance margin of 50% was appropriate. EPA, *PM CEMS Random Error Contribution by Emission Limit*, at 2 (Mar. 22, 2023) (Docket ID EPA-HQ-OAR-2018-0794-5786) ("PM CEMS Memo") (noting "an operational target limit … [of] one-half of the emission limit" and setting "target compliance levels" at half the limit).

Despite all of this, EPA refused to take a compliance margin into account. EPA says it must ignore this information because (1) whether to adopt a compliance margin is in "the sole decision of owners and operators," and (2) EPA does not have data showing all sources will adopt the same

compliance margin. 89 Fed. Reg. at 38,521. This has never stopped EPA before. EPA regularly accounts for factors outside its control in rulemaking. It is required by law to do so. *Miami–Dade Cnty. v. EPA*, 529 F.3d 1049, 1065 (11th Cir. 2008) ("EPA is compelled to exercise its judgment in the face of scientific uncertainty unless that uncertainty is so profound that it precludes any reasoned judgment."). EPA has information on which to act. It has taken similar action in the past. Now it refuses to do so with the thinnest of justifications.

Demonstrating just how plausible it would have been to account for a compliance margin and accurately assess the Rule's impacts, EPA begrudgingly assumes for the sake of argument, and then dismisses, a 20% margin. EPA states:

> [A] 20 percent compliance margin assumption to a fPM limit of 0.010 lb/MMBtu would increase the number of affected EGUs from 33 to 53 … and the annual compliance costs from $87.2M to $147.7M. The number of EGUs that demonstrated an ability to meet the lower fPM limit, but do not do so on average and therefore would require O&M [(operation and maintenance)], would increase from 17 to 27 (including the compliance margin). Similarly, the number of ESP upgrades (previously 11) and bag upgrades (previously 3) would also increase (to 20 and 4,

respectively). There would be no change in the number of new FF [(fabric filter)] installs. Therefore, cost-effectiveness values for fPM and individual and total non-[mercury] HAP metals would only increase slightly.

89 Fed. Reg. at 38,521. According to EPA, then, accounting for a small compliance margin of only 20% would (1) increase the Rule's cost by approximately 70%, and (2) almost double the number of units that would have to upgrade their controls, at great cost. Proper consideration of this information could have resulted in a very different rulemaking.

Instead, without any analysis or explanation, EPA simply announces: "Therefore, cost-effectiveness values for fPM and individual and total non-[mercury] HAP metals would only increase slightly." *Id*. This conclusion does not follow from the sentences before it. This is not reasoned decisionmaking. EPA must, at a minimum, "identify the stepping stones to its final decision." *Costle*, 657 F.2d at 333. It must explain its reasons for the determinations it has made, not proclaim the outcome.

The Rule's cost effectiveness would be even more stark if EPA accounted for a 50% compliance margin, which its own record recognizes as the likely "target" rate, PM CEMS Memo at 2. EPA did not do that analysis,

but it did consider an alternative, proposed standard of 0.060 lb/mmBtu, which is the equivalent of the final standard of 0.01 lb/mmBtu with a compliance margin of 40%. *See* 89 Fed. Reg. at 38,518. That analysis yielded a cost-effectiveness of $17,500,000/ton HAPs removed—about a 67% increase over EPA's cost-effectiveness with no compliance margin. 2024 Technical Memo at 16-17, Table 4.

EPA cannot ignore the real-world implications of its regulations. As the Supreme Court made clear, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation omitted). EPA has relevant data but refused to use them. EPA knows EGUs operate with a compliance margin but refused to account for one in its analysis. The Rule is arbitrary and capricious.

### 3. EPA's Failure to Account for the Shortened Life of the Vast Majority of Coal-Fired EGUs is Deeply Flawed.

The remaining useful life of a source subject to an EPA rule is a major determinant of whether that rule will be cost-effective. As EPA has explained:

You treat the requirement to consider the source's "remaining useful life" … as one element of the overall cost analysis. The "remaining useful life" of a source, if it represents a relatively short time period, may affect the annualized costs of retrofit controls. For example, the methods for calculating annualized costs in EPA's Control Cost Manual require the use of a specified time period for amortization that varies based upon the type of control. If the remaining useful life will clearly exceed this time period, the remaining useful life has essentially no effect on control costs…. *Where the remaining useful life is less than the time period for amortizing costs, you should use this shorter time period in your cost calculations*.

66 Fed. Reg. 38,108, 38,126 (July 20, 2001) (emphasis added). Thus, the remaining useful life of a source can render the requirement for additional controls impossible to justify on a cost-effectiveness basis. That is the case here, but EPA refused to accept the facts.

Commenters noted the maximum life of the vast majority of coal-fired EGUs (after the effective date of this Rule) is just five years. RTC at 42-43. That is because EPA's recently promulgated rule to regulate greenhouse gases from EGUs makes retirement within about five years the only realistic option for most coal-fired plants. *See* 89 Fed. Reg. 39,798 (May 9, 2024)

("GHG Rule").[13] EPA turned a blind eye to this important fact and forged ahead with its unreasonable cost-effectiveness analysis.[14]

Instead, EPA assumed any unit without an announced retirement date has a life of 15 years and spread the capital cost of any control upgrades or new controls over that period. The resulting "capital charge rate," a measure of cost over time,[15] is 11.04%. 2024 Technical Memo, Attach. 1. But when the

---

[13] EPA's GHG Rule requires coal-fired EGUs to meet a carbon dioxide emission rate based on carbon, capture, and sequestration by January 1, 2032, and exempts from the GHG Rule any coal-fired EGU that agrees to permanently cease operation by that date. 89 Fed. Reg. at 39,801. For many reasons, this requirement is impossible for the vast majority of units, and they will have to retire and take the exemption to avoid violating the rule.

[14] *See also*, Talen & Northwestern Mot. For Stay, at 11-13 (EPA's failure to consider the interaction between this Rule and the GHG Rule arbitrary and capricious)

[15] A capital charge rate "is used to convert the capital cost into a stream of levelized annual payments that ensures capital recovery of an investment. The number of payments is equal to book life of the unit or the years of its book life included in the planning horizon (whichever is shorter)." EPA, *Documentation for EPA's Power Sector Modeling Platform v6 - Summer 2021 Reference Case*, at 10-12 (Sept. 20, 2021), https://www.epa.gov/power-sector-modeling/documentation-epas-power-sector-modeling-platform-v6-summer-2021-reference.

unit's life is shortened due to the GHG Rule, the charge rate drastically in-creases.

For the Mayo plant, slated to be retired in 2031 according to EPA (ap-proximately 5 years after the Rule becomes effective in 2027), the capital charge is 38.44%, *id.*, or 3.5 times that for a 15-year life.[16] Using EPA's as-sumptions, the cost-effectiveness for the Colstrip powerplant, for instance, is not about $16 million/ton of non-Hg metal HAPs removed, *see id.*; it would be 3.5 times more, or about $55 million/ton. That is a cost-effectiveness that is several times higher than levels EPA previously found not cost-effective. *See, e.g.*, Westmoreland Mot. For Stay, at 11&n.8.

This same cost multiplier applies to any unit that would have to up-grade its control to meet the standard (and as discussed above in Section I.B., there are many more units that will need upgraded controls than those

---

[16] According to EPA, Mayo would have to undertake an expensive ESP up-grade by 2027 before retiring in 2031. The resulting cost-effectiveness is an eye popping $76,775,000/ton of HAP removed. 2024 Technical Memo, At-tach. 1.

identified by EPA). Ignoring reality is arbitrary and capricious. *See NRDC*, 808 F.3d at 574 (agency may not turn a blind eye to relevant facts).

For these reasons, Petitioners are likely to succeed on the merits.

## II. The Balance of Harms and the Public Interest Weigh Heavily in Favor of a Stay.

### A. Absent a Stay, the Rule Will Cause Irreparable Harm to Petitioners and Their Members.

Previous motions amply demonstrate the substantial, irreparable harm the industry will suffer if the Rule is not stayed. Some of the declarants in support of these motions are also members of Petitioners, and the harm they describe is the same as that for similarly situated EGUs. Petitioners adopt fellow Movants' arguments on irreparable harm to "avoid duplicative filings and repetitious arguments." Order 2, ECF#2062459.

### B. A Stay Will Not Harm the Public

As discussed above in Section I.A, all of the coal-fired EGUs that would have to expend significant resources to install new controls or upgrade existing controls to meet the new fPM standard have cancer risks that are 1 to 3 orders of magnitude less than the 1-in1-million risk standard Congress put in the Clean Air Act and that is the gold standard for risk analysis.

Imposing the new standard on these units would not move the needle on risk. Indeed, shutting down every one of these units would avoid only one excess cancer case every 371 years. Considering that the stay would last no more than a few years, depending on how long this case takes to be resolved, there is absolutely no harm to the public from a stay.

## C.     The Public Interest Weighs in Favor of a Stay

A stay is in the public interest. If the Rule remains in effect during litigation, this will impose substantial costs on a handful of powerplants or could lead to their premature shutdown, while providing virtually no benefit to the general public or the environment relating to HAPs. Moreover, these costs—one way or the other—will end up being borne by the general public and the customers of the companies who operate these powerplants (e.g., through increased rates). Staying the Rule, on the other hand, will help to ensure the availability of reliable and affordable electricity.

## CONCLUSION

For these reasons, this Court should stay EPA's Rule.

Dated: July 8, 2024                    Respectfully submitted,

*/s/ Makram B. Jaber*
Makram B. Jaber
Allison D. Wood
Aaron M. Flynn
MCGUIRE WOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 857-1700
mjaber@mcguirewoods.com
awood@mcguirewoods.com
aflynn@mcguirewoods.com

*Counsel for Petitioners America's Power
and Electric Generators MATS Coalition*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(5), (6) and D.C. Circuit Rules 27(a)(2), I certify that: This motion complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because it contains 5,145 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f) and 27(a)(2)(B). This motion complies with the typeface and type style requirements of Fed. R. App. P. 27(d)(1)(E) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word version 16.61 Palatino Linotype 14-point font.

*/s/ Makram B. Jaber*
Makram B. Jaber

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of July 2024, I filed the foregoing

motion with the Clerk of the Court using the CM/ECF System, which will

send notice of such filing to all registered CM/ECF users.

/s/ Makram B. Jaber
Makram B. Jaber